**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

UNITED STATES OF AMERICA:

v.

CHRISTOPHER SNYDER

Defendant.

-------------------------------------------------------- x

:  Case No. 1:25-cr-00195 (MAD)
:
:
:
:
:
:
:
:
:
:

## DEFENDANT CHRISTOPHER SNYDER'S SENTENCING MEMORANDUM

Solomon B. Shinerock
Christina O. Gotsis
Morrison Cohen LLP
909 Third Avenue
New York, New York 10022
(212) 735-8600
*Counsel for Christopher Snyder*

Dated: March 30, 2026

## TABLE OF CONTENTS

Page

I.      Mr. Snyder's Personal & Professional Background ............................................... 1

II.     The Statutory Sentencing Factors Warrant a Non-Custodial Sentence ............................. 2

    A.      The Nature and Circumstances of the Offense .......................................... 2

        1.      *The Offense was Significant, but Mr. Snyder's Role Was Limited* .......................... 2

        2.      *Relative Culpability and Lack of Authority* ................................ 3

    B.      The History and Characteristics of the Defendant ...................................... 4

        1.      *Mr. Snyder Is A Devoted Father, Husband and Son who will not Reoffend* ........... 4

        2.      *Mr. Snyder's Demonstrated Commitment to Community Service* ......................... 5

    C.      The Requested Sentence Is Consistent with the Seriousness of the Offense, and Provides Just Punishment, Respect, and Deterrence ................................. 5

    D.      The Need to Avoid Unwarranted Sentencing Disparities ......................................... 6

III.    The Guidelines Analysis .................................................................. 7

    A.      The Loss Amount Is a Poor Proxy for Mr. Snyder's Culpability Here ..................... 7

    B.      Mr. Snyder is Entitled to a Zero-Point Offender Adjustment Under U.S.S.G. § 4C1.1 ..................................................................... 9

IV.     Conclusion ........................................................................... 10

On April 16, 2026, Defendant Christopher Snyder will be sentenced on his guilty plea to conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1349 and 1343. Mr. Snyder comes before this Court with deep remorse for his conduct and a sense of sorrow for the harm he caused. He respectfully submits this memorandum in advance of sentencing to assist the Court in fashioning a sentence that is "sufficient, but not greater than necessary," to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a). Mr. Snyder respectfully requests a non-custodial sentence, such as a sentence of probation with appropriate conditions, including restitution and community service. Letters of support from his family, friends, colleagues and community members are attached hereto and incorporated as part of this memorandum at Exhibits(1) – (9).

## I.    Mr. Snyder's Personal & Professional Background

Christopher Snyder is a committed husband and father of two young sons, K., aged 6, and R., aged 3. Raised in Virginia, where he continues to reside today, Mr. Snyder earned a bachelor's degree in computer science from the University of Virginia in 2003. Other than the current offense he has no history of criminal conduct, substance abuse, or instability.

Beginning in approximately 2003, Mr. Snyder became a primary caregiver for his mother, who was suffering from spinocerebellar ataxia—a rare, progressive, and ultimately fatal neurological disease. As her condition deteriorated, her needs became increasingly intensive. For nearly fourteen years, and especially during the final seven years of her life, Mr. Snyder structured his daily existence around her care. During that latter period, his mother was bedridden and ventilator-dependent, requiring constant attention. Mr. Snyder managed her medications, assisted with hygiene and mobility, coordinated medical appointments, oversaw in-home caregivers, prepared meals, and maintained a constant physical presence so that she could remain in her home rather than be institutionalized. To accommodate these responsibilities, he reorganized his work, personal relationships, and long-term plans, making sustained sacrifices over more than a decade. His mother passed away in 2017 at the age of fifty-seven.

Following his mother's death, Mr. Snyder returned to steady full-time employment. For approximately a decade prior to the offense conduct, he worked in clinical environments as a medical device representative, including at Medtronic and other companies. In that role, he regularly assisted surgeons in operating rooms and was entrusted with ensuring that critical medical equipment functioned properly during surgical procedures—work that demanded reliability, preparation, and trust by those around him.

During the same period, Mr. Snyder built a family of his own. He married Lilli Snyder and they had two children together. He has been consistently involved in their daily lives, including school drop-offs and pick-ups, homework, and extracurricular activities. In 2015, Mr. Snyder's wife was diagnosed with breast cancer, a diagnosis that abruptly altered the course of their young marriage. The period that followed was marked by surgery, medical treatment, and sustained uncertainty about her health and future. During this time, Mr. Snyder became his wife's primary source of stability—accompanying her to medical appointments, managing daily responsibilities at home, and ensuring that she could focus on treatment and recovery without additional stress. The emotional strain of confronting a life-threatening illness within his immediate family was compounded by the practical demands of caregiving, which Mr. Snyder absorbed without interruption to his work or family obligations. Although his wife is now in remission, the

1

experience remains a defining chapter in their lives and further reflects Mr. Snyder's consistent assumption of responsibility for the care and well-being of others.

## II.    The Statutory Sentencing Factors Warrant a Non-Custodial Sentence

This Court has the broad discretion to determine the appropriate degree of punishment. *United States v. Ingram*, 721 F.3d 35, 37 (2d Cir. 2013).  In exercising that discretion, the Court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of [Section 3553(a)]." 18 U.S.C. § 3553(a) (emphasis added). These purposes include: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

In addition to considering each of these purposes, the Court shall also consider "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)), "the kinds of sentences available," (18 U.S.C. § 3553(a)(3)), and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" (18 U.S.C. § 3553(a)(6)).

"In deciding what sentence will be 'sufficient, but not greater than necessary' to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a 'generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain.'" *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (quoting Guido Calabresi, What Makes a Judge Great: To A. Leon Higginbotham, Jr., 142 U. Pa. L. Rev. 513, 513 (1993)). The Court "must conduct its own independent review of the . . . sentencing factors [under Section 3553(a)]" and "may not presume that a Guidelines sentence is reasonable." *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010).

### A.    The Nature and Circumstances of the Offense

Mr. Snyder stands before the Court having pled guilty to a single count of conspiracy to commit wire fraud, arising from his participation in a broader fraudulent lending scheme involving Prime Capital Ventures, LLC ("Prime Capital"). As set forth in the Information, Plea Agreement, and Presentence Investigation Report ("PSR"), the conspiracy involved false representations to prospective borrower clients regarding Prime's ability to fund large commercial loans and the purported handling and refundability of due-diligence fees and other payments.

He does not minimize the seriousness of that offense, the harm suffered by victims, or his responsibility for knowingly participating in wrongful conduct. At the same time, the Court is required to evaluate his conduct, as distinct from the conduct of his co-conspirators.

#### 1.    *The Offense was Significant, but Mr. Snyder's Role Was Limited*

Mr. Snyder met co-conspirator Kris Roglieri because, as an ambitious young professional focused on supporting his family, he paid a substantial sum to enroll himself and his sister, co-conspirator Kimberly Humphrey, in a business course offered by Mr. Roglieri. Mr. Roglieri

2

impressed with purported connections, awards, and status symbols, exemplifying a model of financial success to which Mr. Snyder aspired.

Mr. Roglieri and Ms. Humphrey founded Prime Capital in December 2021, PSR para. 12. Mr. Snyder joined Prime Capital thereafter, believing it to be a legitimate financial services operation. As set forth in the Information and his plea agreement, Mr. Snyder did not knowingly join the conspiracy until June 2023. *See* PSR para. 2. In a sense, Mr. Snyder was a victim of Mr. Roglieri's fraudulent persona before he became a co-conspirator—he borrowed money to take Mr. Roglieri's course, and ultimately agreed to join Prime Capital believing it offered him a chance at the finance job with the very person who seemed to embody financial success.

As reflected in the plea agreement and the PSR, Mr. Snyder:

- Did not originate the fraudulent scheme;
- Did not identify or solicit borrower victims;
- Did not exercise decision-making authority;
- Did not control Prime Capital's bank accounts;
- Did not determine how victim funds were disbursed or dissipated; and
- Did not personally cause the large-scale financial hardship suffered by many victims.

Instead, Mr. Snyder functioned in a subordinate, back-office role, preparing documents, responding to borrower inquiries, and performing administrative tasks at the direction of others. His compensation consisted of periodic payments determined by his co-conspirators, and his personal financial gain—approximately $615,500 over the course of the conspiracy—was a small fraction of the overall loss and pales in comparison to the sums controlled and dissipated by others. Importantly, his periodic receipt of proceeds of the crime was generally commensurate with a legitimate role in a lending operation, and he did not receive large lump-sum distributions or otherwise expend victim funds on a lavish lifestyle.

The Guidelines attempt to account for relative culpability through a minor-role adjustment, but that modest reduction cannot fully counterbalance a loss-driven offense level that mechanically treats all participants as equally culpable. Courts routinely recognize that, in large fraud cases, the loss table may "overstate the seriousness of the offense" when applied to lower-level participants. This is such a case.

2.      *Relative Culpability and Lack of Authority*

The undisputed record shows that co-conspirator Kris Roglieri was the central figure in the offense. His reputation, personal relationships, and control over Prime Capital's finances were the *sine qua non* of the scheme. He—not Mr. Snyder—solicited borrowers, signed contracts, controlled the accounts, and he personally spent vast sums of victim funds.

Mr. Snyder, by contrast, lacked the authority, autonomy, and leverage to direct the course of the conspiracy. For much of the charged period, he did not know the full extent of Roglieri's misconduct or lavish spending. Importantly, the PSR acknowledges that less loss was inflicted during the period of Mr. Snyder's participation, underscoring his more limited role. *See* PSR para.

65 ("As detailed in the offense conduct section, during the defendant's participation in the conspiracy, less loss was inflicted on victims as opposed to other members of the conspiracy and the defendant benefited less from the criminal activity than Humphrey and significantly less than Roglieri.").

A sentence that treats Mr. Snyder similarly to the architects and primary beneficiaries of the fraud—as the Guidelines sentence here suggests—would fail to reflect the "nature and circumstances of the offense" as Congress intended.

## B.    The History and Characteristics of the Defendant

Mr. Snyder's background reflects a life characterized by dependability and caregiving. A group of extraordinary character letters addressed to the Court are attached, and as the below discussion reflects, they share some common themes relevant to the decision before the Court. What distinguishes this body of support is not only its consistency, but the stature and credibility of the authors, including senior physicians, a public-school superintendent, a director-level investigative executive, and long-standing community leaders. The letters describe Mr. Snyder as a person of integrity, accountability, and sustained service to others, for whom the offense conduct is highly aberrational.

The letters also demonstrate that Mr. Snyder possesses the strength of character and the community ties necessary to avoid re-offending, and this supports a conclusion that the requested non-incarceratory sentence would be sufficient to protect the public and meet the rehabilitative goals set forth in  18 U.S.C. 3553(a).

### 1.    *Mr. Snyder Is A Devoted Father, Husband and Son who will not Reoffend*

Mr. Snyder is the father of two young sons, ages six and three. He is not a distant or nominal parent, but an active, daily presence in their lives. He is responsible for school drop-offs and pickups, assists with schoolwork, attends extracurricular activities, and volunteers as a coach. He shares in the full range of caregiving responsibilities—meals, routines, discipline, and emotional support—that provide his children with stability, structure, and a consistent sense of security during their formative years. His involvement is not occasional or supplemental; it is foundational to the daily functioning of his household.

Mr. Snyder's role within his family is particularly significant given his wife's medical history. In 2015, while still early in their marriage, his wife was diagnosed with breast cancer and underwent surgery and treatment. During that period, Mr. Snyder served as her primary source of support, accompanying her to medical appointments, managing household responsibilities, and ensuring continuity and stability at home during an extended period of uncertainty and fear. Although his wife is now in remission, the experience left a lasting impact on their family, and Mr. Snyder remains a central caregiver and stabilizing presence as they continue to rebuild and move forward together.

Mr. Snyder's irreplaceable role in his family is underscored by his consistent prioritization of responsibility to others, even at great personal sacrifice: For example, for nearly fourteen years, Mr. Snyder served as the primary caregiver for his mother as she battled spinocerebellar ataxia, a degenerative and ultimately fatal neurological disease. For seven of those years, she was bedridden

4

and ventilator-dependent. Mr. Snyder provided continuous, hands-on care: managing medications, assisting with hygiene and mobility, preparing meals, coordinating medical appointments, overseeing in-home caregivers, and maintaining a constant physical presence. His devotion allowed his mother to remain in her home rather than be institutionalized, at enormous personal sacrifice. Mr. Snyder's brother recounts, "[Mr. Snyder] rearranged his personal and professional life to ensure Mom was cared for with dignity and love. … His presence is meaningful and stabilizing." Exhibit 1 - Letter of Corey Snyder.

These responsibilities reflect a man whose daily life is defined by care, reliability, and presence—both at home and in the community. Removing Mr. Snyder from his family for a prolonged period would not simply punish him; it would impose substantial and foreseeable harm on two very young children and on a family that has already endured significant medical and emotional strain.

### 2.    *Mr. Snyder's Demonstrated Commitment to Community Service*

"Beyond [his] family, Mr. Snyder has consistently sought to serve his community. Whether through volunteering his time, helping neighbors in need, or supporting local initiatives, he has demonstrated a willingness to give back. He is the kind of person others call when they need help moving, repairs done, or simply someone to listen." Indeed, Mr. Snyder is dedicated to playing a role in the lives of not only his own children but children in the community. As a volunteer wrestling coach for elementary and middle-school students, Mr. Snyder consistently gives his time and energy to young people in his community. One coach who has worked alongside him wrote: "He volunteers his time and consistently shows up. … The kids love working with Coach Snyder as he is patient and kind with the children. We are lucky that Chris chooses to volunteer his time with us because it is a thankless job and not something many are willing to do." Exhibit 2 - Letter of James S. Arnett.

Mr. Snyder is also deeply involved in a local Kung Fu school. As described in a letter submitted to the Court, Mr. Snyder "regularly opens the Kung Fu school and leads classes," and is "always generous with time and effort to help teach the newer students." Exhibit 3 - Letter of Dr. Robert Squatrito. His presence is not symbolic: "[t]he Kung Fu school, his family, his sons, and his community would be greatly adversely affected by [Mr. Snyder's] absence."

For several years, Mr. Snyder has also served on his neighborhood Homeowners Association Board, where a fellow board member described him as "dedicated, reliable, and deeply helpful," noting that he approached both complex governance issues and neighbor concerns with collaboration and integrity. Exhibit 4 - Letter of Sean Mraz.

Taken together, these roles demonstrate that Mr. Snyder is deeply embedded in his community in visible, trust-based positions that demand reliability, integrity, and accountability on a daily basis.

### C.    **The Requested Sentence Is Consistent with the Seriousness of the Offense, and Provides Just Punishment, Respect, and Deterrence**

Mr. Snyder fully appreciates the seriousness of his offense and will live with the regret and consequences of his decisions for the rest of his life. Importantly, Mr. Snyder has accepted

responsibility at every stage of this case. He pled guilty, admitted his conduct, and expressed sincere remorse for the harm he caused. Before charges were filed, he voluntarily provided documentary evidence and information to law enforcement, demonstrating accountability rather than evasion. Those who know him well uniformly describe this same trait: a willingness to confront mistakes directly rather than avoid them. As one character witness wrote, "Mr. Snyder does not deflect responsibility, make excuses, or shift blame. When something is his own, he owns it fully. … His judgment is sound, his demeanor is steady, and his actions are guided by doing what is right rather than what is convenient." Exhibit 5 - Letter of Billy Clark.

At the same time, sentencing is an individualized inquiry, and courts have long recognized that in certain cases—particularly those involving first-time, non-violent offenders who did not design or control the offense—the certainty of punishment may be more impactful than its length. Here, Mr. Snyder's felony conviction, public prosecution, financial penalties, and restitution obligations already represent severe and lasting consequences. Those consequences are magnified by Mr. Snyder's unusually visible role in his community. He is not an anonymous defendant. He has served openly as a youth wrestling coach, a Kung Fu instructor, a Homeowners Association board member, and a trusted presence in local schools, athletic programs, and community organizations. His identity has long been tied to leadership, mentorship, and service. As a result, the public nature of this prosecution has carried an acute reputational cost—one that will follow him permanently in the very communities where he lives, works, and raises his children.

For someone whose daily life is grounded in public trust and accountability, the embarrassment, loss of standing, and disappointment of those he mentors and leads constitute a powerful and enduring deterrent. Mr. Snyder cannot—and will not—escape the consequences of this conviction. The certainty that his actions are now publicly known, and that he must live with that knowledge in full view of his community, provides a level of specific deterrence that additional incarceration would not meaningfully enhance.

The likelihood that Mr. Snyder will reoffend is also exceedingly low. He has no prior criminal history, no history of violence, and no prior involvement in financial misconduct. His offense conduct occurred during a limited period of his life, in a subordinate role, within a dysfunctional enterprise controlled by others. There is no indication that Mr. Snyder poses any ongoing risk to the public or that he will engage in future fraudulent conduct.

A non-custodial sentence would still reflect the seriousness of the offense while recognizing that Mr. Snyder has already taken meaningful steps toward rehabilitation.

### D.    <u>The Need to Avoid Unwarranted Sentencing Disparities</u>

Imposing a custodial sentence on Mr. Snyder based primarily on a loss figure he did not originate, control, or dissipate would create precisely the kind of unwarranted disparity the statute seeks to prevent. The record establishes that Mr. Snyder did not design the scheme, did not exercise decision-making authority, did not control the proceeds, and did not reap the outsized financial benefits that drove the offense. Treating him as interchangeable with those who exercised authority and dominated the scheme would ignore these material distinctions and would undermine proportionality.

The Guidelines themselves recognize this risk. While loss amount serves as a rough proxy for harm, it does not—and cannot—capture differences in intent, leverage, or personal culpability among co-participants. As a result, strict adherence to loss-driven ranges in cases involving subordinate participants can distort relative culpability rather than illuminate it. A variance is therefore necessary to ensure that Mr. Snyder's sentence reflects his conduct, rather than the aggregate conduct of the conspiracy as a whole.

A non-custodial sentence here is also consistent with the broader sentencing framework this Court has repeatedly applied in fraud cases involving defendants who were not the architects of the offense, did not control the flow of funds, and demonstrated genuine acceptance of responsibility. In such cases, courts have recognized that advisory ranges driven almost entirely by loss can overstate individual culpability, and that probationary or substantially below-Guidelines sentences will fully satisfy the purposes of sentencing under § 3553(a).

## III.    **The Guidelines Analysis**

Mr. Snyder's lack of a criminal record places him in Criminal History Category I. As reflected in the Plea Agreement and PSR, the parties have stipulated to the following guidelines calculations:

- **Base Offense Level:** 7, pursuant to U.S.S.G. § 2B1.1(a)(1).
- **Loss Amount Enhancement:** A 22-level increase under U.S.S.G. § 2B1.1(b)(1)(L), based on an aggregate loss amount of more than $25 million but less than $65 million, attributable to the conspiracy as a whole.
- **Number of Victims:** A 2-level increase under U.S.S.G. § 2B1.1(b)(2)(A)(i).
- **Role Adjustment:** A 2-level decrease for minor role under U.S.S.G. § 3B1.2(b), reflecting Mr. Snyder's limited authority and relative culpability.
- **Acceptance of Responsibility:** A 3-level reduction under U.S.S.G. § 3E1.1(a) and (b).

There are two significant considerations which the Court should consider in evaluating the appropriate Guidelines scoring and Mr. Snyder's request for a non-Guidelines sentence.

### A.    **The Loss Amount Is a Poor Proxy for Mr. Snyder's Culpability Here**

The Guidelines range in this case is driven overwhelmingly by the loss-amount enhancement under U.S.S.G. §2B1.1. That enhancement, while designed to capture the seriousness of large-scale frauds, operates mechanically: it aggregates total losses attributable to the conspiracy as a whole, without regard to who exercised control over those losses, who made the decisions that caused them, or who possessed the authority to stop or redirect the flow of funds. Indeed, as the Court will recall, the same 22-level enhancement drives the guidelines range applicable to the scheme's leader, Kris Roglieri, who is differently situated and bears more culpability and participated for a longer period when compared to Mr. Snyder.

In cases like this one—where a defendant played a subordinate role within a broader scheme—the loss table can dramatically overstate individual culpability. While the Guidelines provide a useful starting point, they do not—and cannot—capture the critical distinctions in

authority, intent, and financial control that separate Mr. Snyder from the principal architects of the fraud. For that reason, the advisory range substantially overstates the seriousness of Mr. Snyder's individual conduct and must be evaluated in light of the full range of factors set forth in 18 U.S.C. § 3553(a).

Mr. Snyder does not dispute the core facts of the offense or his knowing participation once he became aware of the fraudulent nature of the scheme. He accepts responsibility for his conduct and the harm suffered by victims. At the same time, the undisputed record demonstrates that he did not originate the scheme, did not recruit or solicit borrowers, and did not control Prime Capital's bank accounts or the disposition of victim funds. His role was limited to preparing documents, communicating with borrowers at the direction of others, and performing administrative and back-office tasks within a company that he initially believed to be a legitimate start-up commercial lender. He received proceeds from the offense in periodic payments set by his co-conspirators, in amounts consistent with his belief that he was serving in an entry-level operational role rather than directing a multi-million-dollar enterprise.

By contrast, the conspiracy was driven by co-conspirators who possessed the reputational capital, decision-making authority, and financial control necessary to solicit borrowers, sign binding contracts, and divert tens of millions of dollars in client funds. Those individuals controlled Prime Capital's accounts, determined how funds would be used, and made unilateral decisions to dissipate victim money through transfers and personal expenditures. Mr. Snyder lacked that authority and leverage. He did not decide which borrowers would be solicited, how much money would be taken, or where that money would go once received. His participation, while criminal and regrettable, was qualitatively different from that of those who designed, directed, and financially dominated the scheme.

This distinction matters because the loss-amount enhancement treats all participants as equally responsible for the full amount of loss once foreseeability is established, even where— as here—culpability, authority, and benefit diverge sharply. In this case, although Roglieri was an organizer and leader of the conspiracy, he is subject to the same loss amount enhancement as Mr. Snyder. *See* Case No. 24 CR 392 (MAD), Dkt. No. 99, p. 3. Courts have long recognized that in the Guidelines place "inordinate emphasis" on loss in fraud cases involving large losses, which can produce ranges that are incongruent with culpability. *U.S. v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) ("Where the Sentencing Guidelines provide reasonable guidance, they are of considerable help to any judge in fashioning a sentence that is fair, just, and reasonable. But where, as here, the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences."); *see also U.S. v. Algahaim*, 842 F.3d 796 (2d Cir. 2016) (remanding to permit the sentencing judge to consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence).

Here, the loss amount captures the catastrophic harm caused by the conspiracy as a whole, but it does not meaningfully distinguish between those who exercised control and those who did not. When combined with the absence of aggravating role enhancements and the application of a mitigating-role adjustment, the loss-driven range yields a sentence that exaggerates Mr. Snyder's personal culpability relative to his actual conduct. Instead, the Court should be guided by an

application of § 3553(a)'s core mandate to impose a sentence that is sufficient, but not greater than necessary, to reflect the defendant's own actions, intent, and role.

### B.    Mr. Snyder is Entitled to a Zero-Point Offender Adjustment Under U.S.S.G. § 4C1.1

Mr. Snyder meets the criteria for treatment as a Zero-Point Offender under U.S.S.G. § 4C1.1 entitling him to a two-point reduction in total offense level. He has no prior criminal history, did not use violence or threats, did not possess a firearm or dangerous weapon, did not engage in sex-related conduct, and did not act as an organizer, leader, or supervisor of criminal activity. The sole basis identified in the PSR for denying Zero-Point Offender status is the assertion that Mr. Snyder "personally caused substantial financial hardship" to one or more victims. That conclusion is not supported by the record or by the structure of the Guidelines.

U.S.S.G. § 4C1.1 focuses on the defendant's personal conduct, not the overall consequences of a conspiracy viewed in the aggregate. Here, the PSR's own offense-conduct narrative establishes that the substantial financial hardship suffered by victims was caused by the actions of co-conspirator Kris Roglieri, who originated the scheme, cultivated victim relationships, signed the loan agreements, controlled Prime Capital's bank accounts, and personally dissipated tens of millions of dollars in victim funds through lavish and unilateral expenditures. By contrast, Mr. Snyder functioned in a subordinate, non-decision-making role. He did not solicit victims, did not control or direct the flow of funds, and did not exercise authority over the disposition of proceeds.

Mr. Snyder's involvement also unfolded within a family dynamic that made disengagement more difficult and clouded his judgment as he began to see red flags with what he initially believed to be a legitimate financing operation. As the PSR reflects, he entered the enterprise through his sister, worked under her direction, and lacked the authority and independence within the organization.

The PSR also expressly recognizes that Mr. Snyder was a minor participant under U.S.S.G. §3B1.2 and that "less loss was inflicted" during the period of his involvement. PSR para. 65. Those findings are incompatible with the conclusion that he personally caused substantial financial hardship within the meaning of § 4C1.1. While Mr. Snyder acknowledges—and deeply regrets—his knowing participation in the offense, the Guidelines require a distinction between participation in a fraudulent scheme and personal causation of catastrophic financial harm. Viewing Mr. Snyder's conduct in isolation, the overwhelming majority of victim funds would have remained in Prime Capital's accounts and been available for repayment.

The absence of other potential enhancements available under the Guidelines further confirms that Mr. Snyder is entitled to Zero-Point Offender treatment. No enhancement was applied for aggravating role, managerial authority, use of sophisticated means attributable to him personally, abuse of trust, or obstruction of justice. Nor was any enhancement applied for personally inflicting substantial financial hardship on victims under §2B1.1. To the contrary, the Guidelines already account for Mr. Snyder's relative culpability through the minor-role reduction and the absence of individualized aggravating factors.

9

In short, denying Zero-Point Offender status based on the overall harm caused by the conspiracy—rather than Mr. Snyder's own personal conduct—would effectively collapse §4C1.1 into a strict-liability provision for all fraud defendants, contrary to the Guidelines' structure and intent. Where, as here, a defendant with no criminal history played a limited role, lacked decision-making authority, did not control proceeds, and did not personally inflict substantial financial hardship, the Zero-Point Offender adjustment is appropriate and warranted.

***

Applying U.S.S.G. § 4C1.1 would result in a further 2 point reduction, resulting in a total offense level of 24 and a guidelines range of 51 to 63 months, and that is before taking into consideration the outsize impact of the loss amount calculation or any of the factors falling under 18 U.S.C. § 3553(a).

In any event,, the guidelines range is a poor proxy for the appropriate sentence in a case like this, and that is tacitly acknowledged in the PSR. The PSR reports that for defendants whose primary guideline was §2B1.1 with a total offense level is 26 and criminal history category is I, the guidelines range of imprisonment is 63-78 months, (PSR para. 99), but during the last 5 fiscal years such defendants have received average terms of imprisonment substantially below the lower end of that range.

## IV.    **Conclusion**

Mr. Snyder committed a serious offense, and he accepts responsibility for his role. The advisory guidelines range—driven almost entirely by aggregate loss—fails to capture the required statutory considerations, including with respect to his role, lack of authority, personal history, genuine remorse, and prospects for rehabilitation.

In view of all the § 3553(a) factors, we respectfully submit that a non-custodial sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing. Mr. Snyder requests that the Court impose a sentence of probation with appropriate conditions, which will allow him to continue to care for his children, make restitution, and live as a productive, law-abiding member of the community.

Respectfully submitted,


Solomon Shinerock
Counsel for Christopher Snyder

10